## THE HUNTER No. 2.

(*District Court, W. D. Pennsylvania.* January 8, 1885.)

1. COLLISION—UNLICENSED PILOT AT WHEEL—FAULT.

While the mere fact that an unlicensed pilot was at the wheel at the time of a collision will not of itself fix the responsibility therefor, yet that circumstance may well be taken into consideration in determining the question of which party was at fault.

2. SAME—CONFLICTING EVIDENCE.

In a conflict of evidence as to the exact position at the time of a collision of a fleet of flat-boats, moored at an abutment at the libelants' landing, greater weight should be given to the testimony of the witnesses who, by reason of their connection with the fleet, had the better opportunity of knowing what the fact was.

In Admiralty.

*Morton & Hunter*, for libelants.

*Barton & Son*, for respondents.

ACHESON, J. This suit is for the recovery of damages caused by the sinking of the libelants' flat, loaded with coal, which occurred about noon of May 17, 1882. This flat was one of a fleet moored at the libelants' abutment or ice-breaker at their landing at East Liverpool, Ohio. It was struck by a flat in the tow of the steam tow-boat Hunter No. 2, and sunk immediately after the collision. The tow-boat, having seven craft in tow, had come down the Ohio river, her destination being the landing of Turnbull & Sharp, which is a few hundred feet above the libelants' landing on the same side of the river. She attempted to land at the abutment of Turnbull & Sharp, but failed to do so, missing the landing, and in backing out from the Ohio shore the collision occurred. Charles E. Sloane, the pilot of the tow-boat, in his testimony says: "We lost control of the boat and tow that far that we missed making the landing at Turnbull & Sharp's." But why they so lost control of the boat and tow he does not satisfactorily explain. It is true, the water was high,—at a stage of about 18 feet; but Sloane further states: "We have made that landing at Turnbull & Sharp's frequently before on water about the same stage. There was nothing unusual in the water, nor in the size of our fleet, nor in the elements, to prevent us making the landing, excepting a

little wind, which was not very strong, and which we encounter nearly every trip." At the time of the collision, Sloane was not in the pilot-house, as he should have been. The captain of the tow-boat, Henry W. Wolfe, who, though a licensed Monongahela river pilot, was not licensed to run as pilot on the Ohio river, was then at the wheel, and had been for some time, perhaps half an hour. It is, indeed, testified that Sloane was also in the pilot-house up until within a few minutes of the collision, when, seeing it imminent, he ran forward to the Hunter flat and cut it loose from the tow. Now, while the mere fact that Wolfe was not a licensed Ohio river pilot would not of itself fix responsibility for the collision upon the Hunter No. 2, yet, in determining the question of negligence, the fact that the wrong man was at the wheel may well be taken into consideration.

A careful reading of the testimony has brought me to the conclusion that in approaching the landing of Turnbull & Sharp, on this occasion, the tow-boat was not properly handled. She should have "rounded to" above their landing, and got straightened up in the river by the time she reached their abutment; but this she failed to do, and was not in good shape to make the landing. George F. Thompson, the mate of the tow-boat, says: "We were out of our ordinary course when we were not straightened up opposite the landing of Turnbull & Sharp, in shape to make the landing." I am quite clear that the navigation of the tow-boat here was faulty, and led to the subsequent collision, although it is perhaps true, that, after the boat failed to make her landing, reasonably proper efforts were made to avoid the collision.

But it is claimed on the part of the defense that the libelants' flat was too far out in the river, and was an improper and unlawful obstruction to navigation, and that the collision was due to this fact. The respondents claim that their diagram — Exhibit A — correctly shows the position of the libelants' fleet on this occasion, and that the whole fleet (the upper tier containing six pieces) lay entirely outside of the libelants' abutment. The testimony directly upon this point is conflicting, but, in my judgment, the clear weight of it is against the respondents. Such of their witnesses as place the whole fleet outside the abutment, in view of their respective stand-points of observation, may well be mistaken as to the exact position of the fleet. The libelants' witnesses (being connected with the fleet) had a much better opportunity to know what the fact was, and they testify that the fleet lay below the abutment, but extending outside of it by the width of two flats and one-half only. There is very strong circumstantial evidence sustaining the witnesses for the libelants in respect to the position of their fleet. Thus it is shown beyond any question that the Hunter flat, which did the mischief, and which was but 80 feet long, after its stroke rebounded and lodged on the libelants' abutment. Now this was scarcely possible if the fleet lay wholly outside the abutment, whether the injured flat was the extreme outside one, as the respond-

ents say, or next to the outside, as the libelants affirm. This, Capt. Wolfe, in the course of his cross-examination, is forced to admit. Again, Joseph Merrington, the wrecker who raised the sunken flat, testifies that he found its lower end on a line with the outside edge of the abutment. Furthermore, in the then stage of water it would seem to have been impracticable to hold the fleet in the position shown by Exhibit A without an anchor or a line fastened to shore above the libelants' landing, neither of which was employed.

Upon the whole evidence, I find that the position of the libelants' fleet was as claimed by them, and that it did not extend outside their abutment more than the breadth of two and one-half flats, or about 40 feet in all. In that position the fleet did not unduly encroach on the river, which, at that time and place, was about one-half mile wide. There was ample room for all the legitimate purposes of navigation outside the libelants' fleet, and, under all the circumstances then existing, the libelants exercised the right of moorage in a reasonable and customary manner. The conclusion I have reached is that the loss in question was due altogether to inexcusable carelessness and want of proper skill on the part of those navigating the towboat Hunter No. 2. The proofs seem to establish the correctness of the several items of the libelants' claim, as set forth in their bill of particulars attached to the libel.

Let a decree in favor of the libelants be drawn for the amount of their claim, with interest from May 17, 1882, and costs.